# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:06CV78-R

PARKDALE AMERICA, LLC and )
PARKDALE MILLS, INC., )
  )
    Plaintiffs, )
  )
    vs. )    **MEMORANDUM AND ORDER**
  )
TRAVELERS CASUALTY AND )
SURETY COMPANY OF AMERICA, )
INC., )
  )
    Defendant. )
  )

**THIS MATTER** is before the Court on the "Plaintiffs' Motion to Compel Production of Information on Other Antitrust Claims" (document #47) and "Brief in Support ..." (document #49), both filed January 23, 2007; and "Defendant's Memorandum in Opposition ..." (document #50) filed February 8, 2007.

On February 23, 2007, the Plaintiffs filed their "Reply ..." (document #52).

On October 10, 2007, this motion was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §636(b)(1)(B), and is now ripe for the Court's consideration.

Having carefully reviewed the pleadings, record, arguments of counsel, and applicable authority, the Court will <u>grant</u> the Plaintiffs' Motion to Compel, as discussed below.

## I. FACTUAL AND PROCEDURAL HISTORY

In this action, the Plaintiffs, Parkdale America, LLC and Parkdale Mills, Inc., related North Carolina corporations that manufacture and sell yarn (hereafter "Plaintiffs"), seek a declaratory judgment that pursuant to an insurance contract between the parties, the Defendant Travelers

Casualty and Surety Company of America, Inc., a Connecticut insurance company, is obligated to defend and indemnify the Plaintiffs concerning claims in ten underlying antitrust lawsuits. The Plaintiffs also assert state claims for breach of contract, bad faith denial of insurance claims, and unfair and deceptive trade practices.

On August 26, 2002, the Defendant issued the Plaintiffs "The Wrap Policy No. 103911311," which included "Directors and Officers Liability and Fiduciary Liability Coverage Parts" providing that coverage was "written on a claims made basis ... cover[ing] only claims first made against insureds during the policy period." The coverage limit, including both cost of defense and indemnification, was $3 million. Although there was a boilerplate provision in the policy excluding coverage for any loss arising from an antitrust violation, the Plaintiffs paid an additional premium specifically for an endorsement covering antitrust violation, that is, an endorsement entitled "Delete Antitrust Exclusion" which "deleted [the antitrust exclusion] in its entirety."

The Policy also contained other exclusions of coverage which were not deleted, including exclusions if any "Insured Person" had knowledge of the antitrust activity prior to August 26, 2002 when the Policy was first issued, and/or if the loss arose from "any profit, remuneration or advantage to which [the insured] was not legally entitled." The Defendant contends that both of these exclusions preclude coverage of the subject claims.

The Plaintiffs allege that sometime in November 2003, it received information suggesting that John M. Smeak, Jr., then one of its Vice-Presidents and its President of Sales, had engaged in a price-fixing scheme among multiple manufacturers and sellers of cotton yarn. The Plaintiffs retained the law firm Reed Smith, LLP ("Reed Smith") to investigate Mr. Smeak's activities and to advise the Plaintiffs regarding their future course of action. As part of their investigation, Reed

Smith attorneys conducted a very broad "sweep" for documents and electronic data in order to preserve all relevant information dating back to the beginning of the suspected price-fixing scheme in 2000, and to determine when Mr. Smeak, and, consequently, the Plaintiffs, had begun to participate in the scheme. Reed Smith attorneys also interviewed certain of Plaintiffs' employees and other potential witnesses.

Following Reed Smith's investigation, sometime in late 2003, the Plaintiffs voluntarily notified the United States Department of Justice's Antitrust Division ("DOJ") that they had violated federal antitrust laws by engaging in a scheme to fix prices in the markets for open-end and air-jet cotton yarns. Specifically, the Plaintiffs informed DOJ that Mr. Smeak had unlawfully fixed these prices. Thereafter, in December 2003, the Plaintiffs were conditionally accepted into the DOJ's Corporate Amnesty Program and executed the DOJ's Conditional Leniency Agreement ("the Leniency Agreement"). The Leniency Agreement required that the Plaintiffs cooperate with the DOJ's ongoing investigation, including its subsequent requests for documents and access to witnesses.

In February 2004, the Plaintiffs and Mr. Smeak entered into a Confidential Separation and Mutual General Release Agreement ("the Separation Agreement"), in which the Plaintiffs agreed to pay Mr. Smeak an amount equal to his annual salary plus $100,000, to provide certain benefits, and to reimburse his expenses, including attorney's fees, incurred due to the DOJ investigation and any related civil actions. In exchange, Mr. Smeak agreed, among other things, that he would cooperate fully with the Plaintiffs and the DOJ and in any resulting civil actions by "rendering the facts truthfully as he has to date, and testifying truthfully at any trial, hearing or deposition."

In March 2004, the first of ten civil antitrust lawsuits was filed against the Plaintiffs and other

cotton yarn sellers. Ultimately, nine of those lawsuits, each of which had been filed in either this Court or the United States District Court for Middle District of North Carolina, were consolidated in the Middle District under the caption In re Cotton Yarn Antitrust Litigation, NCMD File No. 1:04MD01622.[1] The tenth lawsuit, Christian v. Parkdale Mills, Inc., Civil No. CT-002304-04, is pending in the Circuit Court of Tennessee for Shelby County.

On November 22, 2004, the Plaintiffs' Chief Financial Officer Dan Wilson met with Darwin Boyd, one of the Defendant's brokers, to discuss renewal of the Policy, which was due to expire in early 2005. The Plaintiffs allege that during this meeting, Mr. Boyd pointed out that the Policy contained the special endorsement removing the antitrust exclusion, that is, that there might be coverage of the subject antitrust claims, which Plaintiffs contend was the first time they had considered this possibility.

On November 24, 2004, the Plaintiffs made a claim under the Policy with the Defendant, demanding that the Defendant both defend and indemnify them in the subject antitrust litigation. The parties dispute the nature of the Defendant's response to the Plaintiffs' claim. The Defendant contends that it "promptly" agreed to provide the Plaintiffs with a defense, reserving its rights to deny coverage for any loss not insurable under the Policy or for which coverage was barred by law. The Plaintiffs maintain, however, that the Defendant made an "illusory" promise to defend, reserving its right to recoup defense expenses if coverage was subsequently denied, and agreeing to engage Reed Smith only on the conditions that the law firm: (1) acknowledge in writing that the Defendant (rather than the Plaintiffs) was its client and (2) reduce substantially the rates that it had been

---

[1] See In re Cotton Yarn Antitrust Litigation, ___ F. 3d. ___, ___ (4th Cir. October 12, 2007) (vacating district court order denying motion to compel arbitration and remanding for further proceedings).

charging the Plaintiffs up to that point. It is undisputed that Reed Smith and the Defendant were never able to agree on the terms of Reed Smith's representation, and that the Defendant never retained alternate counsel. Accordingly, the Plaintiffs continued to pay for their own defense in all ten lawsuits.

The nine actions consolidated in the Middle District of North Carolina were settled, at least as to the Plaintiffs, on August 26, 2005, when they deposited $7.8 million into a settlement fund. The Plaintiffs allege, and the Defendant does not presently dispute, that earlier in 2005, Reed Smith had notified the Defendant concerning ongoing settlement discussions and invited the Defendant to participate, but that the Defendant declined, citing an absence of coverage.

Following the underlying settlement, the Plaintiffs demanded that the Defendant reimburse their defense costs and settlement payment, up to the $3 million policy limit, which the Defendant again denied. The Defendant contended, then and now, that the Plaintiffs' payment to the settlement fund constituted "restitution" to the victims of the price-fixing scheme that it was required to make under the terms of the DOJ's leniency program, and that such restitution is excluded from coverage under the Policy as a matter of law.

On February 22, 2006, the Plaintiffs filed this action, seeking a declaratory judgment affirming coverage and damages for breach of contract, bad faith settlement of insurance claims, and unfair and deceptive trade practices.

On April 20, 2006, the DOJ granted the Plaintiffs' leniency application. As a result, Mr. Smeak was granted "immunity" as that term is defined in the Leniency Agreement. Specifically, the Agreement provides that:

> Current directors, officers and employees of [Plaintiffs] ... shall not be prosecuted

criminally by the Antitrust Division for any offense committed ... in connection with the anticompetitive activity being reported ... [but that] [t]he commitments in this paragraph are binding only upon the Antitrust Division, although upon the request of [Plaintiffs], the Antitrust Division will bring this Agreement to the attention of other prosecuting offices or administrative agencies.

On April 24, 2006, although continuing to deny coverage for the August 2005 settlement, the Defendant offered to pay a portion of the Plaintiffs' defense costs incurred in the underlying litigation (without reserving its right to recoup those expenses should it prevail on the issue of coverage), and remitted $280,319.50 to the Plaintiffs on May 10, 2006. The parties continue to dispute, however, whether this payment was in full satisfaction of all post-notice defense costs.

The parties have conducted extensive discovery by any standard. To date, the Plaintiffs have produced to the Defendant everything produced to the DOJ during the prior investigation and/or produced or received during discovery in the underlying antitrust actions. The Plaintiffs' production includes more than 32,000 pages of documents and 550,000 electronic "pages" of Mr. Smeak's emails, a substantial majority of which were produced from Reed Smith's files.

Concerning the subject "Motion to Compel Production of Information on Other Antitrust Claims," on July 27, 2006, the Plaintiffs served their First Set of Interrogatories and Requests for Production of Documents. The Plaintiffs requested, inter alia, identification of any occasion on or after January 1, 2000 that the Defendant paid or denied a claim under the antitrust coverage endorsement discussed above, and that the Defendant provide sufficient identifying information of those claims to enable the Plaintiffs to search public records for lawsuits filed in relation to those claims. The Plaintiffs also requested a copy of the Complaint in any such litigation.

Initially, the Defendant objected to responding to this line of inquiry in any fashion, resulting

in extensive discussions by counsel aimed at resolving these and other discovery disputes.[2]

On September 13, 2006, the parties submitted a "Joint Motion for Entry of Stipulated Protective Order," which the District Judge to whom this case was then assigned (the Honorable Graham C. Mullen) granted. See "Protective Order" (document #17). The Protective Order provides, inter alia, that a party may designate any material produced in discovery which it deems confidential as "CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER," that all material so designated may be disclosed only to participants in and for uses limited to this litigation, and that all such confidential information will be destroyed at the conclusion of this litigation.

On November 17, 2006, the Defendant informed the Plaintiffs that there have been five responsive claims (in addition to these claims) and provided brief summaries of each claim. Notwithstanding the entry of the Protective Order in the interim, however, the Defendant continued to refuse to provide any identifying information concerning those claims, contending that none of the insureds who had made those claims had consented to such disclosure by the Defendant.

Subsequently, defense counsel informed Plaintiffs' counsel that two of the insureds had consented to the disclosure of identifying information about their claims. Concerning the first identified claim, the Plaintiffs were able electronically to access the court file in the relevant litigation but concluded that the case did not involve an insurance claim similar to that at issue here. Concerning the second identified claim, the Plaintiffs have contacted counsel for the claimant and has requested a copy of the Complaint in the underlying action.

---

[2] There are two other outstanding discovery Motions in this action which will be resolved in a separate Order following the previously scheduled Status Conference noted in Section III. See Defendant's "Motion to Compel Discovery Response" (document #19) and Plaintiffs' "Motion for Protective Order" (document #29). On October 26, 2007, the undersigned denied the Defendant's "Motion to Compel" Mr. Smeak's deposition and held in abeyance for consideration by Judge Reidinger the Defendant's alternate Motion that it be allowed an adverse inference jury instruction. See "Memorandum and Order" (document #55).

On January 23, 2007, the Plaintiffs filed the subject Motion to Compel the identification of the other previously unidentified claims, along with production of a copy of any Complaint filed in subject litigation. It is undisputed that the information and Complaints sought are readily accessible in the Defendant's files.

The Plaintiffs' Motion has been fully briefed and is, therefore, ripe for determination.

## II. DISCUSSION

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The rules of discovery are to be accorded broad and liberal construction. See Herbert v. Lando, 441 U.S. 153, 177 (1979); and Hickman v. Taylor, 329 U.S. 495, 507 (1947). However, a litigant is not entitled to conduct discovery that is intended to harass, annoy, embarrass, or oppress the opposing party. See Fed. R. Civ. P. 26(c).

Whether to grant or deny a motion to compel is generally left within the district court's broad discretion. See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 929 (4th Cir. 1995) (district courts' rulings on discovery motions reviewed on appeal for abuse of discretion); Erdmann v. Preferred Research Inc., 852 F.2d 788, 792 (4th Cir. 1988) (noting district court's substantial discretion in resolving motions to compel); and LaRouche v. National Broadcasting Co., 780 F.2d 1134, 1139 (4th Cir. 1986) (same).

Applying these principles to the facts in this case, the information that the Plaintiffs seek is reasonably calculated to lead to the discovery of admissible evidence. Indeed, evidence of the Defendant's practices concerning and its treatment of similar claims, if any, could be relevant and material to the Plaintiffs' bad faith and/or unfair and deceptive trade practices claims.

Moreover, the undersigned is satisfied that the Defendant's and its insureds' concerns about confidentiality are more than adequately addressed by the Protective Order, discussed above, which was entered months ago and is enforceable under the Court's contempt powers. This is particularly true where the information sought may be confidential in the Defendant's hands as between the Defendant and its insureds, but otherwise is contained in public records that are not confidential. In short, insofar as the Plaintiffs seek very limited confidential information from the Defendant to aid in their independent search for public information, their request is reasonable and will therefore be granted.

### III. ORDER

**NOW THEREFORE, IT IS HEREBY ORDERED:**

1. The "Plaintiffs' Motion to Compel Production of Information on Other Antitrust Claims" (document #47) is **GRANTED**, that is, on or before November 27, 2007 the Defendant shall fully identify any claim made on or after January 1, 2000 under an antitrust coverage provision or endorsement in any of its policies, and shall produce a copy of any Complaint filed pursuant to any such claim.

2. Per "Order" filed October 11, 2007 (document #54), on **Wednesday, November 14, 2007 at 10:00 a.m**, the parties' respective counsel shall appear in the chambers of the undersigned for

9

a Status Conference to discuss the merits of any then pending discovery motions, as well as the appointment of a mediator. Provided further, at the Court's discretion, rather than an informal Status Conference, the November 14, 2007 Conference may be conducted on the record in a Courtroom.

    3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties; <u>and to the Honorable Martin K. Reidinger</u>.

**SO ORDERED.**

Signed: October 30, 2007

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge